# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MANUEL DE JESUS GARCIA-GARCIA,<br><br>Petitioner,<br><br>vs.<br><br>ERIC H. HOLDER, Attorney General of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CITIZENSHIP AND IMMIGRATION,<br><br>Respondents. | CASE NO. 08CV1129-LAB (AJB)<br><br>**ORDER FOLLOWING EVIDENTIARY HEARING;**<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT; AND**<br><br>**ORDER DENYING PETITION FOR NATURALIZATION** |

Petitioner, a native and citizen of Guatemala, filed his Petition in this case seeking review of a denial of his application for naturalization. The Petition requests an order requiring that his application for naturalization be granted and that he be naturalized as a U.S. citizen.

The United States Citizenship and Immigration Service (USCIS) found Petitioner lacked good moral character pursuant to 8 U.S.C. § 1101(f)(6) and 8 C.F.R. § 316.10(b)(2)(vi). Specifically, he was found to have made misrepresentations on his application and to have falsely testified that he did not assist anyone's illegal entry into the

U.S. The parties filed cross-motions for summary judgment, and Petitioner requested in the alternative summary adjudication.

Petitioner requested an evidentiary hearing in the event the Court was inclined to grant Respondents' motion. On February 9, 2010, the Court issued an order denying the cross motions without prejudice and granting Petitioner's request for a hearing. The order vacated the final pretrial conference on Monday, March 15, 2010 and scheduled the evidentiary hearing in its place. The order said the Court would consider the briefing on the cross motions as the primary hearing briefs, but directed the parties to file a notice stating what testimony or supplementary evidence they intended to present at the hearing.

Respondents then filed supplemental evidence to be considered at the hearing. Petitioner filed nothing, and did not appear at the hearing. At the hearing, the Court considered the evidence before it and rendered judgment for Respondents, noting it would issue an order explaining its ruling in greater detail. The Court noted that it would have granted summary judgment for Respondents had Petitioner not requested a hearing.

Four days later, on March 19, Petitioner moved for reconsideration. Petitioner's counsel represented that he had not received notice of the hearing, but did not explain why he did not prepare for or appear at the pretrial conference that had been scheduled at the same time. Petitioner's counsel concedes he received Respondents' filings in preparation for the hearing but did not read them. In addition, the Court's records show Petitioner's counsel did receive electronic notice of the hearing. On March 24, the Court issued an order denying reconsideration and noting that the hearing could not have affected the outcome of this action in any event. In that order, the Court also said it would render judgment in this action later in a separate order. This is that order.

**I.    Legal Standards**

A person whose application for naturalization has been denied after a hearing before an immigration officer under 8 U.S.C. § 1447(a) may seek review of the denial in U.S. district court. 8 U.S.C. § 1421(c). The review is de novo, and the Court is to make its own findings of fact and conclusions of law. *Id.* The de novo standard means the Court does not defer

to the USCIS's findings or conclusions. *United States v. Hovsepian*, 359 F.3d 1144, 1162 (9th Cir. 2004). The Court does not review all prior proceedings de novo, only the USCIS's findings and conclusions regarding the naturalization proceedings being reviewed. *See id.* (explaining the application of § 1421(c)). The decisions of courts and adjudicative agencies in other proceedings may if appropriate have preclusive effect. *See Sabbaghi v. Napolitano*, 2009 WL 4927902, slip op. at *4 (W.D.Wash., Dec. 11, 2009) (discussing case law governing collateral estoppel when reviewing denial of naturalization).

Upon request, a petitioner is ordinarily entitled to a hearing. 8 U.S.C. § 1421(c). This does not necessarily require an evidentiary hearing or bench trial, however, nor is summary judgment precluded where there is no genuine issue of material fact. *Abghari v. Gonzales*, 596 F. Supp. 2d 1336, 1343–44 (C.D.Cal., 2009) (citing *Chan v. Gantner*, 464 F.3d 289, 295–96 (2d. Cir. 2006)). Petitioner bears the burden of showing he is entitled to naturalization. *Berenyi v. I.N.S.*, 385 U.S. 630, 673 (1967).

The Supreme Court has held that § 1106(f)6)'s prohibition covers only false testimony under oath for the subjective purpose of obtaining immigration benefits. *Kungys v. United States*, 485 U.S. 759, 780 (1988). This does not include inaccurate testimony due to faulty memory, vague questioning, or other factors having no bearing on an applicant's character for truthfulness. *United States v. Hovsepian*, 422 F.3d 883, 887–88 (9th Cir. 2005) (en banc).

**II.   Factual Discussion**

In 1986 and again in 1987, Petitioner was arrested and pleaded guilty to violations of 8 U.S.C. § 1325, for assisting aliens to elude examination and inspection by immigration officials. These two incidents occurred at checkpoints within the U.S., and Petitioner maintained he had picked up the aliens within the U.S., and had not helped them enter the U.S. While the parties devote a good part of their briefing to these incidents, the Court finds the motions can be resolved more directly by relying on a third incident on August 8, 1995, when Petitioner was stopped while entering the U.S. from Mexico and accused of alien
/ / /

smuggling. The Court therefore focuses its discussion on that incident and the exclusion proceedings that followed.

Petitioner was a frequent border crosser, having crossed into Tijuana roughly a hundred times. (Resps.' Mot., Ex. O at 110:14–18). He explains the trip on August 8, 1995 by saying he went to Tijuana to buy medicine for his wife. He was driving a 1985 Toyota pickup truck with a camper shell. (Resps.' Mot., Ex. Z (Pet'r's Depo. Tr.) at 257–59.) The truck's locks were working and he believed he locked his truck when he parked it, but the lock on the camper shell was broken. (*Id*.) It was a single cab truck, with no extra space behind the front seat for passengers.

On his return trip, a large man was concealed in the cab behind the passenger's seat. Petitioner says he knew nothing about this, and did not suspect anything after driving for several hours, until shortly before he reached the checkpoint, when he felt movement behind him. He did not look behind the seat, but instead hit it, and the movement stopped. As he neared the port of entry, he says he attempted to summon an officer to let them know someone was hiding in his truck, but was unable to get the officer's attention. He proceeded to the inspection point without taking any further action. He says he did this thinking he would tell the officer there that someone was behind his seat and that as a result nothing would happen to him. Instead, he says, the officer at the inspection point took his credentials and began to walk around the truck to inspect it, even though he was trying to tell the officer someone was hiding in his truck. At the officer's request, Petitioner opened the door to reveal a pair of feet sticking out of the cab of the truck. The officer began to hit the concealed man's feet, causing him to give himself up.

Petitioner was then handcuffed, questioned and, he says, pressured and terrified into admitting wrongdoing. Videotapes were made of the questioning but are no longer available.[1] Petitioner was not prosecuted, but on August 30, 1995, was put in exclusion

---

[1] Respondents represent that they tried to obtain the tapes, but that video recordings are retained for six years. Petitioner appears to argue the tapes' destruction taints the case against him, but cites no authority in support of this proposition. He offers no evidence to show the tapes were wrongfully disposed of. The tapes were available at the time of his hearing in 1996.

- 4 -

proceedings pursuant to 8 U.S.C. § 1182(a)(6)(E)(I). He testified at the proceedings before an immigration judge, who found him excludable but granted a waiver of removal. Although the immigration judge found the equities warranted granting the waiver, he specifically found Petitioner's story was not credible and noted "the reluctance of Mr. Garcia to recognize his wrongdoing and his attempts to shield the court from it." (Resp.'s Mot., Ex. Q at 214.)[2] The immigration judge also ruled the confession was voluntary and admitted it as evidence. Both parties appealed, and the Board of Immigration Appeals dismissed both appeals, affirming the immigration judge's decision.

Later, the USCIS relied on the hearing before the immigration judge, the immigration judge's findings, and Petitioner's naturalization interview to find he had given false testimony. (Resps.' Mot., Ex. W at 245–46 (USCIS Decision, Jan. 11, 2007); Pet., Ex. 1 (USCIS Final Determination, Feb. 25, 2008).) Both decisions were broad, and relied on general findings that, contrary to his testimony and statements during the interview, Petitioner had at some time helped one or more persons illegally enter the U.S.[3]

/ / /

Except as noted, the facts set forth above are undisputed. The Respondent offers

---

[2] In his opposition, Petitioner objected that the transcript is incomplete because it omits the more detailed oral findings. The transcript itself, however, indicates the judge went off the record to render his oral decision, so it is not part of that transcript. In addition, Respondents attached the separate transcript of the oral decision to their reply brief. Petitioner also raised generalized objections to the fairness of this proceeding which are addressed more fully in note 5, *infra*.

[3] Petitioner construes the basis for the decision narrowly as being based solely on his application for naturalization (Pet'r's Mot. at 3:2–6), apparently implying the Court's review is limited to the bases relied on by USCIS. The Ninth Circuit has not expressly ruled on this point, but it appears to contradict the de novo standard, *see Camara v. Chertoff*, 2008 WL 80933 at *5 (N.D.Cal., Jan. 7, 2008) (noting tension between de novo standard and holding of *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005)), as well as the holding of at least one other circuit. *See Aparicio v. Blakeway*, 302 F.3d 437, 445 (5th Cir. 2002) ("Judicial review of naturalization denials . . . is not limited to any administrative record but rather may be on facts established in and found by the district court de novo.")

In any event, the Court need not confine its inquiry to the application itself, since USCIS's reasoning is broader than Petitioner's summary implies. USCIS's explanation as set forth in the Decision also mentions the hearings in 1996, including the immigration judge's finding that Petitioner's testimony was not credible, and the Final Determination simply cites the regulation and finds Petitioner gave false testimony.

- 5 -

portions of the transcripts of the hearings before the immigration judge on May 8 and 24, 1996, at which Petitioner was represented by counsel. (Resp.'s Mot., Exs. O (May 8 Tr.), P (May 24 Tr.).) Those transcript record, among other things, Petitioner's own sworn testimony about the 1995 incident. Although Petitioner argues otherwise, that testimony was given to obtain immigration benefits, namely to show either that Petitioner was not excludable or to show he was entitled to a waiver. Furthermore, Petitioner's statement on his naturalization application that he had never made a false statement to obtain immigration benefits was also made for the purpose of obtaining benefits.

At the first hearing before the immigration judge on May 8, Petitioner initially testified he entered Mexico around 6:00 p.m. (May 8 Tr. at 154:2–4, 155:18–21.)[4] He said he went to a drugstore in Tijuana and attempted to return via the Otay Mesa Port of Entry, but it was closed. (*Id*. at 155:13–15.) He decided to go through the Otay port because it was the closest and quickest way back. (*Id*. at 154:16–18.) He testified his pregnant wife was in the hospital in the U.S. but the hospital couldn't give her medicine to help with her pain, so he was going to Tijuana to buy it. (*Id*. at 152:3–9.) When it was pointed out that this would mean he spent four hours buying the medicine, Petitioner clarified that he meant he left his house at 6:00, was stopped by U.S. authorities for about 30 minutes before entering Mexico, and only entered Mexico around 7:20 or 7:30 p.m. (*Id*. at 156:6–25.) He says it took him about 30 or 40 minutes to buy the medicine, because he had to ask what medicine he needed. (*Id*. at 157:12–18.) He said he attempted to re-enter at the Otay Mesa Port of Entry, but after waiting two hours, when he had nearly reached the front of the line, it closed. (Id. at 155:10–12, 157:24–158:6.) He testified he then went to the San Ysidro Port of Entry,

/ / /

/ / /

where he reached the front of the line roughly an hour later, at 11:00 p.m. (*Id*. at

---

[4] The exhibits are paginated consecutively but the pagination does not correspond to the actual page numbers in the docket. For purposes of this order, the Court will refer to the page numbers typed at the bottom of the exhibit pages, which also correspond to the page numbers set forth in the briefing.

138:11–14.)[5] Petitioner's testimony makes clear traffic was heavy, so driving was slow.

This recorded testimony is highly incredible, and the immigration judge noted many of the implausibilities. The Court notes many other improbable statements. According to the testimony, Mr. Molina, purportedly a stowaway whom Petitioner had never met, was a large man. If Petitioner's testimony is to be believed, Mr. Molina broke into a stranger's truck, crawled in through the camper shell, climbed through the window into the truck's cab, and squeezed behind the seat into a space from which he could not easily extricate himself without help and where he would likely be detected. The Court also notes that for Mr. Molina to fit into the truck as Petitioner said, the seat would have had to be adjusted very far forward. Furthermore, Mr. Molina's feet were visible as soon as the driver's side door was opened. Petitioner offered no explanation how he could have gotten into the truck without seeing Mr. Molina or noticing anything was wrong.

Petitioner's accounts of the wait times at the two ports of entry are also incredible. According to his first version of the facts, he waited at the Otay Mesa port for two hours until he, along with everyone else in line, was turned away. Then he drove to the San Ysidro port six miles away and a mere hour after being turned away from Otay Mesa found himself at the front of the line. This is particularly improbable bearing in mind the slow driving conditions and the crowd of border crossers turned away from Otay Mesa, most of whom would presumably have gone to San Ysidro just as Petitioner did.

Petitioner's recorded testimony is also self-contradictory. In particular, his testimony concerning who or what he thought might be in his car changed under cross examination as the weakness of his story was exposed.

Petitioner testified he had no idea anyone was in his truck until shortly before he approached the inspection point at the San Ysidro Port of Entry, when something began to move behind the seat. (Resps.' Mot., Ex. P at 176:16–22.) He then hit the seat and the

---

[5] In his later deposition taken January 16, 2009 in this matter, Petitioner changed or clarified these times somewhat, testifying he left San Diego for Tijuana after sunset, that the drugstore was located about a 10 to 15 minute drive from the Otay port of entry, and that he waited in the line at San Ysidro only about 30 to 35 minutes. (Petr.'s Depo. Tr. at 257–58.)

- 7 -

1 movement stopped. (*Id*. at 176:23–177:2.) At the May 24 hearing, Petitioner, while being
2 questioned by his own attorney, explained that he did not stop or attempt to get the person
3 out of his car at that point because he planned to tell an official at the inspection station
4 someone was in his car. (*Id*. at 177:16–23.) He testified that if he did this, he believed he
5 would not get in trouble and that the officers would simply question whoever was hiding
6 behind the seat. (*Id*. at 177:21–23, 180:19–181:2; *see also id*. at 201:7–15 (testifying that
7 he was not afraid of being prosecuted for or accused of alien smuggling, because he had
8 never smuggled aliens before).) Petitioner testified that the man who was hiding there was
9 so large he could not figure out how the man was able to fit. (*Id*. at 181:8–13.) The man's
10 name was Mr. Molina and Petitioner also testified he had never seen him before. (*Id*. at
11 181:3–7.)

While the Court is mindful that translated testimony may be imprecise and result in apparent inconsistencies where in fact none exist, *see Mendoza Manimbao v. Ashcroft*, 329 F.3d 655, 662 (9th Cir. 2003), it is clear Petitioner at this point was testifying that because of the movement, he knew a person was behind the seat, and that as soon as he realized this he attempted to alert officials so that they could apprehend the stowaway. This is consistent with Petitioner's testimony that Mr. Molina was a large man who was squeezed behind the seat, and whose physical presence was therefore easily detected.

Later, on cross-examination, Petitioner's version of the event changed somewhat. He testified he became angry at Mr. Molina as soon as he discovered him, which led the USCIS's counsel to question him in detail about when he realized a person was in his car. (Resps.' Mot., Ex. P. at 195:7–196:21.) The questioning became so confused that the judge intervened and questioned Petitioner himself. The judge asked Petitioner what he first attempted to tell the officer:

> Q. And what do you mean when you say you tried to talk to the officer? What exactly did you do?
>
> A. I called him.
>
> Q. What did you tell him?

- 8 -

1     A. That I felt that — uh — there was something behind my vehicle.

2     Q. That you felt there was something behind your vehicle?

3     A. Uh — behind the seat.

(*Id*. at 198:5–13.)  After some testimony about the encounter with the first officer, the testimony continued:

> Q. And after the — the officer kept on walking you stayed in your vehicle, waiting until your turn to be inspected to enter the United States?
>
> A. Yes. That's it.
>
> Q. And there was no more movement under the seat?
>
> A. I didn't feel anymore movements but when I arrived there and the officer — uh — at the inspection asked me for my — my card I tried to tell him that I felt something there behind my seat.
>
> Q. All right. Hold it. Now, when you felt that movement when you were waiting in line, what did you think the movement was?
>
> A. I didn't know what it was. It was a person or what was it but I felt a movement through the movement of the seat only.
>
> Q. Well, if you didn't — if you didn't think it was something else other than person, what — what do you think it could have been?
>
> A. Well — well, I don't know. It could have been an animal. I don't know because — uh — the — the person didn't make any noises and the — the movement that I — was there — or I felt the movement.

(*Id*. at 199:7–200:3.)

Here, in the face of difficult adverse questioning, Petitioner changed his testimony in a significant and exculpatory manner, to explain his unusual decision to remain in his truck and proceed to inspection even though he knew a large man was hiding behind the seat. The new explanation, that he didn't realize a person was hiding in his car until after the truck door was opened, explains why he was relatively calm at the time and only became angry later, but contradicts his earlier testimony and is difficult to square with the fact that Mr. Molina was much larger than any animal that was likely to have secreted itself in the truck.

It is also worth noting that, if Petitioner's earlier testimony regarding the timeline is true, a large person or animal had been silently hiding behind his seat for at least three hours before he felt any movement. Both versions of his testimony make clear that he was waiting

in a line of cars when he felt the movement, and that he hit the seat and the movement stopped. Nevertheless, he didn't check to see what had moved nor did he get out of the truck. When he realized a large person or thing was concealed behind the seat, he remained remarkably unruffled and passive instead of alarmed, curious, or fearful of a third alien-related prosecution.[6] This adds to the implausibility of his testimony, and shows the inconsistencies in Petitioner's testimony are not merely misunderstandings or miscommunications.

Whatever the facts were, it is clear at least one of these two versions of the story must be false. Petitioner's testimony was given for the purpose of either demonstrating he was not excludable, or helping him qualify for a waiver of removal. Petitioner's testimony before the immigration judge, and his later statement during the interview that he had never testified falsely to obtain immigration benefits were both therefore untrue. Petitioner's claim that he subjectively believed he was telling the truth about everything he said is insufficient.

Petitioner's opposition brief argues he had no reason to give false testimony at the 1996 hearing, or to lie about what happened later, contending the immigration judge's waiver had immunized him from liability. (Pet'r.'s Opp'n at 10:9–13.) This argument must fail, because when Petitioner was testifying before the immigration judge he had not yet been granted a waiver of removal. In addition, if he did knowingly smuggle Mr. Molina into the U.S. in 1995 and had earlier testified he did not, he would have had strong motives to deny both the smuggling and the false testimony when applying for naturalization.

On the basis of the undisputed evidence, it is therefore clear Petitioner gave untrue testimony for the purpose of gaining immigration benefits. He thus will not be able to meet his burden of demonstrating good character.

/ / /

/ / /

III. *Res Judicata*

---

[6] Later, at his deposition in this case, Petitioner testified that although he could have turned around to look because he was stopped in traffic, he didn't want to because he was afraid of whatever might be hiding behind the seat. (Pet'r's Depo. Tr. at 258.)

As noted, the immigration judge in 1996 found Petitioner knowingly attempted to smuggle an alien into the U.S. illegally and found Petitioner's testimony regarding this incident not credible. With regard to the charge, the judge announced its judgment:

> The Court finds that when examining the totality of the evidence the burden is met to show the applicant knowingly attempted to aid another unauthorized alien to enter the United Sates in violation of law.

(Resps.' Reply, Ex. AA at 19–20.)

With regard to the falsehood of Petitioner's statements, the judge said "part of the reason for the finding of excludability is I don't believe his story." (Resps.' Mot., Ex. Q 214:11–12). In his oral decision, the immigration judge made detailed findings of fact making it particularly clear he found Petitioner's testimony was knowingly false:

> The Court also finds that the credibility of the applicant is seriously questioned in this case. His explanation and testimony contains [*sic*] many implausibilities that were never explained satisfactorily.

The judge discussed the implausibility of Petitioner's testimony explaining why he had been terrorized into pleading guilty to an earlier offense yet never told anyone about it, including the judge or his own lawyer, until shortly before the hearing before the immigration judge. The immigration judge then continued:

> The reason for applicant being in Tijuana is also very nebulous. It is difficult for applicant to believe that the applicant's wife would be in the hospital and the doctors there, or nurses, would not give her medication and that he would have to resort to going to Mexico to buy that medical [*sic*] even though, presumably, the wife is in much pain.
>
> Equally implausible is the fact that he would spend approximately five hours in Mexico to buy medicines even though the wife is in San Diego in great pain.
>
> The time that, he explains, the trip took him is also highly suspect. It should be noted that initially he stated that he went to Mexico at a certain time and then he changed that testimony to indicate that that was the time he left his house. He was also detailing and embellishing his testimony as he went along and realized that there may have been some time gaps that needed to be covered.

(Resps.' Reply, Ex. AA at 22.) The immigration judge discussed other reasons he did not believe Petitioner's story, including what the immigration judge found was Petitioner's own uncoerced admission of guilt (*see, e.g., id.* at 20, 23), and found by clear and convincing

- 11 -

evidence that Petitioner had knowingly helped Mr. Molina illegally enter the United States. (*Id.* at 19–20, 24.)

The doctrine of *res judicata* applies in immigration proceedings, *Ramon-Sepulveda v. I.N.S.*, 824 F.2d 749, 750 (9th Cir. 1987) (citing *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422 (1966)). While the Court does not defer to USCIS's findings or conclusions underlying the denial of naturalization, the findings and decision at issue were made by the immigration judge who is an official in the Executive Office for Immigration Review, an office of the Department of Justice, and not USCIS, which is a bureau of the Department of Homeland Security. In addition, they were made in a separate and earlier proceeding that has been fully litigated and finally determined.

While Respondents did not raise this as an affirmative defense in their answer, *see Inouye v. Kemna*, 504 F.3d 705, 709 n.3 (9th Cir. 2007) (holding that claim and issue preclusion are affirmative defenses that must be pleaded), they may nevertheless raise it for the first time in a motion for summary judgment if the delay does not prejudice the opposing party. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (holding that defendant's untimely assertion of *res judicata* was not prejudicial, because it would have been dispositive if asserted at the outset).

Here, Respondents presented the immigration judge's findings as key evidence in support of their motion. (Resps.' Mot. at 5:16–22.) Petitioner had an opportunity to respond to it, and did so by attacking the fairness of the proceedings and the completeness of the record. (Pet'r's Opp'n at 2 n.2, 7:9–10.) To the extent these objections are not already overruled, the Court does so now.[7] During the earlier proceedings, the question of what

---

[7] Other than the fact that the transcript omits the immigration judge's oral findings, *see* note 2 *supra*, Petitioner raises no specific objection to this evidence. Rather, he makes general objections regarding the fairness and reliability of the proceeding as a whole. In spite of Petitioner's objections concerning the inapplicability of the Federal Rules of Evidence in proceedings before an immigration judge, such proceedings are still required to be fundamentally fair. *See Gu v. Gonzales*, 454 F3d 1014, 1021 (9th Cir. 2006). Petitioner's objection that the use of hearsay evidence violated his rights under the Confrontation Clause is overruled because this is not a criminal proceeding. *Abela v. Gustafson*, 888 F.2d 1258, 1262 (9th Cir. 1989) (holding that naturalization proceedings are civil actions); *United States v. Alisal Water Corp.*, 431 F.3d 643, 658 (9th Cir. 2005) (holding Confrontation Clause inapplicable to civil proceedings).

Petitioner did during the 1995 incident at Otay Mesa was fully litigated, the parties are identical, and a final decision on the merits was issued. The factors required for the application of the doctrine of *res judicata* are met here. *See Owens*, 244 F.3d at 713 (setting forth factors). Thus, the immigration judge's earlier decision is binding on Petitioner.

While the Court's own analysis is a sufficient basis on which to rest its decision, the immigration judge's finding would be adequate as an alternative basis for denial of the petition without a hearing.

**IV.     Conclusion and Order**

Petitioner has not met his burden of coming forward with evidence from which a reasonable trier of fact could find in his favor. On the contrary, the undisputed evidence shows Petitioner made false statements to federal officials in order to obtain immigration benefits, and made false statements on his application for naturalization. The question of whether Petitioner illegally brought an alien into the United States was finally resolved by the immigration judge and Petitioner is bound by this judgment. The Court therefore reconsiders its earlier denial without prejudice of Respondents' motion for summary judgment, and **GRANTS** the motion. All pending requests are **DENIED** as moot and all pending dates are **VACATED**. The Petition is **DENIED**.

**IT IS SO ORDERED**.

DATED: March 29, 2010

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge